THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CLARENCE A. KENNEDY, Defendant-Appellant.

Fifth District    No. 77-198

Opinion filed November 22, 1978.—Rehearing denied December 26, 1978.

Michael J. Rosborough and Rafael Schwimmer, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Thomas H. Sutton, State's Attorney, of Carmi (Bruce D. Irish and Keith P. Vanden Dooren, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

A jury in the circuit court of White County found the defendant, Clarence A. Kennedy, guilty of murder. The defendant was sentenced to not less than 30 nor more than 50 years of imprisonment. The following issues are asserted by the defendant on appeal: the trial court erred in denying the defendant's motion to suppress; the trial court erred in

allowing certain statements to be introduced into evidence where the statements were made without proper *Miranda* warnings; and the State failed to sustain its burden of establishing the guilt of the defendant beyond a reasonable doubt.

On June 3, 1976, at approximately 10:45 a.m. the body of Joseph E. Modglin was found dead in the cab of his semitrailer truck which was parked off the eastbound lanes of I-64 at milepost 127.3 in White County. Modglin had been shot nine times in the back. An autopsy was performed at 3 p.m. the same day by Dr. Albert J. Venables who placed the time of death between 48 and 72 hours of the autopsy. The specific time of death could not be narrowed any further than the 24-hour range due to the decomposition of the body. According to the autopsy, death occurred between 3 p.m. May 31 and 3 p.m. June 1.

Sometime around 1 a.m. June 1 the defendant was stopped by Deputy Calvin Boyer on Route 1 near Grayville, only a few miles from the murder scene. Boyer testified that he stopped the defendant because Edwards County had a policy of stopping hitchhikers in order to render assistance or check them out. Deputy Doyle Judge, who was backing up Boyer in case of trouble, approached the defendant and asked him what he was carrying in the brown bag that was being held by the defendant between his legs. The defendant told him that the bag contained a gun. Judge then ordered the defendant to stand at the rear of Boyer's squad car where the defendant was patted down. No other weapons were found on him. Judge then opened the bag and seized the gun inside it. The weapon was a nine-shot .22 caliber High Standard Durango Pistol. The gun was checked through a computer to see if it was stolen. When the computer eventually reported that the gun was not stolen, the defendant was escorted to the Indiana State line and released. However, the deputies kept the gun because the defendant could not produce any proof of ownership or a firearm owner's identification card.

Through police communications Boyer learned of Modglin's death and that he had numerous puncture-type wounds. Boyer knew that a .22 caliber pistol made similar wounds. On a hunch, Boyer turned the gun over to the State Police who ran ballistics tests on it with the bullets found in Modglin's body. Six of the seven bullets removed were positively matched with the gun. Other evidence obtained at the murder scene also linked the defendant to the crime. A jacket was found in the cab which was the same size as a jacket ordered by the defendant while awaiting trial. Also, two human hairs found in the jacket were the same general color as the defendant's.

The first issue raised by the defendant is that the trial court erred in denying his motion to suppress evidence seized after he was questioned and searched by county deputies. With respect to the motion to suppress,

the pertinent facts are as follows. At approximately 1 a.m. on June 1, 1976, deputies Boyer and Judge were driving south on Route 1 in separate patrol cars with Judge in the lead. They were on their way to Grayville to pick up a suspect involved in a matter unrelated to this cause. Boyer testified that while on the outskirts of Grayville he drove past the defendant who was walking north on Route 1. The defendant was walking close to the highway and was on the wrong side for a pedestrian. Because it was the custom in Edwards County for law enforcement officers to stop hitchhikers in order to render assistance or check them out, Boyer turned his vehicle around and approached the defendant. Boyer's motivation for stopping the defendant was not due to any suspicion that criminal activity was afoot. Boyer then radioed his intentions to Judge who likewise turned around and followed Boyer as a backup in case one was needed. The defendant made no attempt to run or hide as Boyer approached, but kept walking instead. He finally stopped when Boyer's vehicle pulled abreast of him. The defendant proceeded to place a bag that he was carrying under his left arm between his knees before Boyer addressed any questions to him.

Initially, Boyer asked the defendant if he was lost. The defendant indicated that he was not, and added that he was on his way to Evansville, Indiana, where he was from. Because the defendant was walking almost in the opposite direction of Evansville, Boyer asked him if he was traveling by way of Princeton, Indiana. The defendant responded affirmatively. Boyer thought it was unusual for the defendant to reach Evansville from Grayville by traveling north on Route 1. The defendant also told Boyer that he had just come from St. Louis and was dropped off a couple of blocks away. Boyer also thought it was unusual for the defendant to hitchhike from St. Louis to Grayville as well as arriving at such a late hour. Boyer then asked the defendant for some identification. The defendant produced a social security card and a military document and handed them to Boyer. Boyer radioed the defendant's name and social security number to the National Crime Information Center (NCIC) computer to see if the defendant was wanted.

By this time, Judge exited his vehicle and approached the defendant. Judge testified that it appeared that the defendant was trying to conceal something by the way he held the bag between his legs. Although Judge did not consider this behavior to be suspicious, he asked the defendant what was in the bag. The defendant responded that it was a gun. Immediately, the defendant was asked by Judge to leave the bag right where he was standing and walk to the rear of Boyer's patrol car. From this location, the bag was no more than eight or 10 feet from the defendant. Judge patted down the defendant and discovered no additional weapons. He then walked over to the bag and removed the

gun. It was handed over to Boyer who ran a check through NCIC to see if it was stolen. The defendant could not produce a bill of sale or other proof of ownership. Judge never asked the defendant's permission to look in the bag, nor did he have a search warrant to do so. Also, the gun which was seized could not be detected without opening the bag.

The response from NCIC pertaining to the defendant and the gun was slow in arriving, and finally Boyer was informed that the computer was temporarily shut down to receive new crime data. Boyer then told the defendant to get in the rear seat of his patrol car. The defendant was informed that he would be free to go as soon as he was cleared by NCIC. The defendant was taken to the Grayville police station to await the results which came back from the computer nearly two hours later. While at the police station, nine spent shells were removed from the seized gun. When the computer check arrived, the defendant and the gun were clear. Boyer then told the defendant that he was free to go and offered to take him to the Indiana State line. However, due to the defendant's failure to produce a firearm owner's identification card or any proof of ownership, Boyer issued the defendant a receipt and kept the gun pending such proof.

From the initial stop of the defendant until he stated that he had a gun, Boyer never told the defendant he was not free to go. Nor did Boyer ever get out of his police car when he talked with the defendant. Throughout the entire encounter with the defendant, both at Route 1 and at the police station in Grayville, Boyer never told the defendant that he was under arrest and at no time did Boyer draw his weapon on the defendant. Judge never arrested the defendant or drew a weapon on him either.

The pistol and the spent shells were subsequently sent to Springfield for ballistics testing. They were positively matched with six of the seven bullets removed from the body of Modglin. The seventh bullet was too badly damaged for testing purposes. The determination that the pistol was in fact the murder weapon served to tie the defendant to other physical evidence found at the scene of the murder. A jacket discovered in the cab of the tractor was the same size as a jacket the defendant ordered while in jail awaiting trial, and strands of human hair found on the jacket were of the same general color as the defendant's.

The defendant filed a motion to suppress the pistol, the nine shell casings, the seven bullets, the jacket and the hair on the basis that it was obtained as a result of an illegal stop of the defendant by Boyer. The trial court denied the motion holding that the stop was a reasonable exercise of police power and the search was lawful under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.

The defendant claims that he was illegally stopped by Boyer because, prior to confronting the defendant on Route 1, Boyer lacked probable

cause to arrest him or reasonable suspicion to detain him and conduct a limited search for weapons as prescribed in *Terry* and sections 107—14, 108—1.01 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, pars. 107—14, 108—1.01). Consequently, the defendant argues that all of the evidence gained as a result of the illegal stop should be excluded as "fruit of the poisonous tree." (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) In the alternative, assuming the defendant was legally stopped he asserts that the search conducted by Judge exceeded the scope authorized by *Terry* and he contends that any evidence gained through the illegal search likewise should be excluded.

Whether or not there was probable cause to stop the defendant, the State maintains that there was reasonable suspicion on the part of the deputies sufficient to render the stop legal under *Terry*. Additionally, the State argues that the search conducted by Judge which resulted in a seizure of the murder weapon was within the parameters of *Terry*.

■■ It is permissible for a police officer to stop an individual and conduct a limited search for weapons even though the officer lacked probable cause to arrest, provided however, that prior to the stop he had reasonable grounds to suspect the individual was engaging in, or was about to engage in, criminal activity, and the officer had reason to believe the individual was armed and dangerous. (*Terry v. Ohio.*) This holding in *Terry* has been embodied in section 107—14 and section 108—1.01 of the Code of Criminal Procedure of 1963. (*People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537.) Section 107—14 provides in part: "A peace officer * * * may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense * * *"; while section 108—1.01 states in brief that "[w]hen a peace officer has stopped a person for temporary questioning pursuant to Section 107—14 of this Code and reasonably suspects that he or another is in danger of attack, he may search the person for weapons." Ill. Rev. Stat. 1975, ch. 38, pars. 107—14, 108—1.01.

The defendant contends that the stop occurred when Boyer asked him to produce some identification, and certainly no later than the moment when Judge asked the defendant what the bag contained while Judge was standing only three feet from the defendant. Assuming the stop occurred within the time frame suggested by the defendant, it would have been illegal because it was made prior to the defendant's admission that a gun was in the bag and at a time when Boyer and Judge had no reason to suspect the defendant was engaged in criminal activity. Thus, Boyer and Judge would have lacked the requisite suspicion necessary to conduct a stop under *Terry* and section 107—14; and it would follow that

they also lacked any reasonable belief that the defendant was armed under *Terry* and section 108—1.01.

The State argues that the stop occurred the moment Judge asked the defendant to step to the rear of Boyer's squad car after he had revealed that there was a gun in the bag he was holding between his legs. At this point in time, given the late hour, the deserted area where the defendant was approached by the deputies, the fact that the defendant was heading away from his stated destination and the fact that he acknowledged possessing a weapon, it would have been reasonable to stop the defendant and conduct a limited search for weapons consistent with *Terry* and sections 107—14, 108—1.01. At the suppression hearing, Boyer acknowledged that he had probable cause to arrest the defendant for possession of a concealed weapon although no arrest was made.

■■ Our determination of the legality of the stop must therefore turn on the narrow issue of when the stop actually occurred. A stop, and therefore a seizure of a person under the fourth and fourteenth amendments, occurs the moment a person's freedom to walk away from a policeman is restrained, even though the restraint falls short of an arrest. (*Terry v. Ohio; People v. Ortiz* (1st Dist. 1973), 18 Ill. App. 3d 431, 305 N.E.2d 418.) This restraint can be deduced from a showing of actual or threatened force on the part of the police officer. (*People v. Ortiz; People v. Jordan* (1st Dist. 1976), 43 Ill. App. 3d 660, 357 N.E.2d 159.) Nevertheless, where a police officer merely engages in conversation with an individual, and no restraint has been made upon the individual's freedom to walk away from the officer, such an encounter does not constitute a stop even though the encounter was investigative in nature. *People v. Jordan; People v. Priest* (1st Dist. 1972), 9 Ill. App. 3d 499, 292 N.E.2d 518; *People v. Howlett* (1st Dist. 1971), 1 Ill. App. 3d 906, 274 N.E.2d 885.

The defendant relies on *Commonwealth v. Jones* (1977), 474 Pa. 364, 378 A. 2d 835, to support his contention that the stop took place the instant Boyer requested the defendant to produce some identification. In *Jones*, the defendant was stopped while hitchhiking by a State policeman in Missouri. After initially asking the defendant to have a seat in the patrol car, the officer ran a check on the defendant through NCIC to see if he was wanted. The officer was alerted that a warrant for the defendant's arrest had been issued in Pennsylvania. The defendant was then told to exit the vehicle, and after doing so, he informed the officer that he had a gun. The officer promptly searched the defendant and seized the weapon. The defendant sought to have the gun suppressed at trial as the fruit of an illegal stop. The Pennsylvania Supreme Court agreed with the defendant and held that the officer's actions constituted an illegal stop. The court concluded that the stop occurred the moment the officer asked the

defendant to enter the squad car. The court looked upon this request as an escalation of the initial confrontation from an attempt to obtain information to an attempt to control the defendant's physical movement.

We find that *Jones* is distinguishable from the case at bar. When Boyer asked the defendant for some identification, he remained seated in his squad car. Boyer did not ask the defendant to sit in the patrol car at this time, nor did Boyer tell the defendant that he was not free to leave. Unlike *Jones*, in the instant case no attempt was made during the identification stage of the defendant's confrontation with the deputies to secure or control his physical movement.

The defendant argues in the alternative that the stop took place when Judge asked him what he had in the bag. Judge was only three feet from the defendant when the question was posed and Boyer was radioing NCIC for possible warrants on the defendant. The defendant contends a stop had occurred because an innocent man under such circumstances would reasonably believe that he was not free to go. We disagree.

> "[T]here must be some element of force or of threatened force in order to constitute a stop. [Citation.] The mere knowledge by the person questioned that the person asking the questions is a police officer cannot in itself constitute a factor of threatened force because, were that so, every question put to a person under any circumstances by a self-identified police officer on duty would by that very fact constitute a *Terry* stop. An officer may ask an individual a question provided he does not confine or restrain the individual without his consent. [Citations.]" (*People v. Jordan*, 43 Ill. App. 3d 660, 662-63, 357 N.E.2d 159, 162.)

Our examination of the record indicates no element of force or of threatened force during this stage of the encounter between the defendant and the deputies.

■■ It is apparent from the facts of this case that the stop took place the instant Judge asked the defendant to walk to the rear of Boyer's patrol car. This was the first attempt by either deputy to control the physical movement of the defendant and was preceded by the defendant's revelation that he had a gun in the bag he was carrying. Given the circumstances of this case and the fact that the defendant was armed, we hold that the subsequent stop by Judge was legal both under *Terry* and sections 107—14, 108—1.01.

Next, the defendant asserts that although the stop may have been legal, the ensuing search of the bag and the seizure of the weapon went beyond the confines of a limited *Terry* search. The defendant, assigning a narrow interpretation to the holding in *Terry*, limits a *Terry* search only to the suspect's outer clothing. Under this view, Judge was not permitted to search the bag lying approximately eight feet from the defendant, and

the subsequent seizure of the weapon constituted a violation of the defendant's fourth and fourteenth amendment rights.

■■ However, we are not inclined to apply *Terry* in such a rigid manner. The fourth amendment does not forbid all searches and seizures, but only unreasonable searches and seizures. (*Elkins v. United States* (1960), 364 U.S. 206, 4 L. Ed. 2d 1669, 80 S. Ct. 1437.) Where swift action is required on the basis of an on the spot observation by a police officer, the legality of a search conducted without a warrant is determined by the reasonableness of the officer's conduct. (*Terry v. Ohio.*)

> "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? [Citations.]" (*Terry v. Ohio*, 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880.)

Under the facts of this case, we hold that the search of the bag and the seizure of the gun were reasonable and not in violation of the fourth and fourteenth amendments. In light of the policy behind *Terry*, a limited search for weapons to protect the safety of the officer conducting the search and others nearby, it would have been unreasonable for Judge not to have searched the bag and seized the weapon. We find unpersuasive the defendant's assertion that since Judge discovered no weapons on the defendant's person, his search of the bag was not motivated by personal safety. It would have been less than prudent on the part of Judge not to secure control over the weapon while questioning the defendant. The search was conducted solely for the discovery of weapons and was not a fishing expedition for other evidence to be used against the defendant. For the reasons stated above, we hold that the stop and search of the defendant were permissible within the purview of the fourth and fourteenth amendments and that the trial court did not err in denying the defendant's motion to suppress.

The next issue we are confronted with is the contention that the trial court committed reversible error by allowing into evidence certain statements made by the defendant. The defendant contends that the statements were made in violation of his fifth, sixth and fourteenth

amendment rights because they were in response to questions addressed to him by Boyer and Judge while he was in custody and before he was given any *Miranda* warnings. In asserting the propriety of the trial court's actions the State argues that *Miranda* warnings were not required since the defendant was never in custody when the statements were made.

As we noted above, the initial restraint on the defendant's freedom of movement occurred at the time he was asked to stand at the rear of Boyer's police car. After the weapon was seized from the bag, Boyer ran a check on it through NCIC to see if it was stolen. The defendant was then asked to sit in the rear seat of Boyer's patrol car. He was told he would be on his way as soon as he was cleared by the computer. The only way the defendant could have exited the vehicle without the aid of either Boyer or Judge would have been to kick out a rear window and open the car door from the outside. Due to the incapacity of the computer, the defendant was taken to the Grayville police station to await the arrival of the requested data. When the computer finally indicated that the gun was not stolen and the defendant was not wanted, he was driven to the Indiana State line and released. Both deputies testified that they never placed the defendant under arrest. Except for being patted down and being seated in the rear of Boyer's vehicle during the drive to Grayville, the defendant had not been physically restrained in any other manner.

The defendant objected to Judge's testimony concerning the defendant's firing of the murder weapon. After examining the pistol at the Grayville police station and finding that it contained nine shells which had been fired, Judge asked the defendant if he had fired the weapon. On the witness stand, Judge stated that the defendant admitted to firing the weapon in a field off I-64. Judge also added that the defendant claimed he had no other shells besides the ones that had been fired. The defendant objected to the latter testimony as well. An objection was also raised with respect to testimony given by Boyer pertaining to the ownership of the gun. Boyer said that the defendant claimed he purchased the pistol at a pawn shop in St. Louis on Memorial Day (the day before he was stopped). All the statements objected to at trial were made after the defendant had been patted down. No *Miranda* warnings were ever given to the defendant prior to the questions by Boyer and Judge which prompted the statements at issue.

■■■ The State initially claims this issue has been waived by the defendant due to his failure to file a written pretrial motion to suppress the statements pursuant to section 114—11(b), (g) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 114—11(b), (g)). This section only applies to the suppression of confessions. Statements or declarations of independent facts upon which the guilt of an individual may be inferred do not constitute a confession. (*People v.*

*Wynekoop* (1934), 359 Ill. 124, 194 N.E. 276.) A confession must be a voluntary acknowledgment of guilt of the perpetration of a crime. (*People v. Georgev* (1967), 38 Ill. 2d 165, 230 N.E.2d 851.) No such acknowledgment was even made by the defendant in his answers to Boyer and Judge. Accordingly, section 114—11 is not applicable in this instance. The defendant has sufficiently preserved the issue for appeal by making timely objections to the relevant testimony of Boyer and Judge as well as raising the matter in his post-trial motion. We will therefore address the issue on the merits.

> "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706-07, 86 S. Ct. 1602, 1612.)

As *Miranda* indicates, a person can be in custody without being formally arrested as long as his freedom of movement is significantly restrained. The rule that *Miranda* warnings must precede custodial interrogation has been recently reiterated in *Oregon v. Mathiason* (1977), 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711; and *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870. Both the defendant and the State agree that the defendant was not given any *Miranda* warnings and that he was not placed under arrest. They differ, however, on whether he was in custody during the questioning.

■■ The existence of a custodial setting must be determined by an objective evaluation of the circumstances surrounding the questioning. (*People v. Wipfler.*) A significant fact is that once the defendant revealed he had a gun, he was asked to step to the rear of the patrol car and was patted down. We find this alone was sufficient control of the defendant's physical movement to warrant a reasonable belief on his part that he was not free to go. We therefore hold that the statements made by the defendant during the encounter on Route 1 were made while he was in custody and should have been preceded by *Miranda* warnings. After the

pat down, the defendant was asked to enter Boyer's squad car. He was told he would be on his way as soon as the results from NCIC cleared him. Additionally, the only way he could exit the squad car was to kick out a rear window. These facts strongly suggest that the defendant was not free to leave while in the squad car or subsequently at the Grayville police station until he was cleared. We find that he was in custody during this time period as well. Therefore, the statements made at the police station before the defendant was cleared by the computer should have been preceded by *Miranda* warnings.

The defendant contends that the *Miranda* violations constituted reversible error. We disagree. Constitutional errors should be regarded as harmless if the reviewing court can say beyond a reasonable doubt that the error did not contribute to the verdict. (*People v. Landgham* (1st Dist. 1970), 122 Ill. App. 2d 9, 257 N.E.2d 484.) "When we say the error did not contribute to the finding of guilty, we mean that the erroneously admitted evidence did not prove an element of the crime not established by other properly admitted evidence." *People v. Landgham,* 122 Ill. App. 2d 9, 24, 257 N.E.2d 484, 492; *People v. Myles* (3d Dist. 1971), 132 Ill. App. 2d 962, 271 N.E.2d 62.

■■ The defendant claims the statements were somehow crucial to the State's case, but he neglects to explain their relevance. One statement pertained to ownership of the murder weapon in which the defendant claimed he bought it in a pawn shop in St. Louis. We fail to see how ownership of the weapon was an important link in the State's case, especially in the face of evidence establishing that the defendant was in possession of the murder weapon within the approximate time of the decedent's death while only a few miles from the murder scene. Under these facts, possession would be more probative than ownership. The defendant asserts that his admissions that he fired the weapon off I-64 and received only nine bullets when he purchased the gun figured prominently in the State's case as well. Although not raised in the defendant's brief, a possible inference which could be drawn from these admissions is that the defendant did indeed kill the decedent by firing the pistol inside the cab of the tractor rather than in a field off the roadway. However, the State's proof of the defendant's guilt was supported by other competent and more persuasive circumstantial evidence which not only established possession of the murder weapon, but established the defendant's presence at the murder scene as well. The defendant was stopped by Boyer and Judge within a few miles of the murder scene and within the period approximated as the time of death. The weapon Judge seized from the defendant during this stop later proved to be the murder weapon. Ballistics confirmed a match among the gun, the shell casings inside the gun and six bullets removed from the body of the decedent.

Furthermore, evidence was introduced tying the defendant to the murder scene. A jacket was found in the cab of the tractor which was the same size as a jacket ordered by the defendant while awaiting trial. The jacket was too small to fit the decedent. Additionally, the jacket contained two human hairs which matched the same general color as the defendant's. Accordingly, we hold that the sufficiency of this evidence rendered the admission of the defendant's statements harmless. *People v. Landgham; People v. Myles.*

■■ The last issue raised by the defendant is that the State failed to prove the defendant guilty beyond a reasonable doubt. The defendant contends that the circumstantial evidence employed by the State to establish the defendant's guilt failed to exclude every reasonable hypothesis consistent with the defendant's innocence. "The general rule is that circumstantial evidence is sufficient to convict; unless there are circumstances contradicting the reasonable inferences and conclusions drawn by the jury from such circumstantial evidence, the determination should not and cannot be disturbed. [Citation.] The jury in a circumstantial evidence case is not required to search out possible explanations compatible with innocence and elevate them to the status of reasonable doubt. [Citations.]" *(People v. Stone* (4th Dist. 1977), 46 Ill. App. 3d 729, 731, 361 N.E.2d 330, 332.) The defendant specifically asserts that the State failed to adequately exclude the possibility that someone else may have entered the cab of the tractor and killed the decedent. As we have stated above, the circumstantial evidence offered by the State was sufficient to support a conviction. The jury was presented with no evidence which could support a reasonable hypothesis of the defendant's innocence, since the defendant neither testified nor put any witnesses on the stand in his behalf. We will not permit the defendant to speculate as to what might have happened and elevate this speculation to the status of reasonable doubt. Therefore, we hold that the evidence presented supported the defendant's conviction beyond a reasonable doubt. For the foregoing reasons, we affirm the defendant's conviction of the crime of murder.

Affirmed.

EBERSPACHER, P. J., and KUNCE, J., concur.