THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAWRENCE HARVEY, Defendant-Appellant.

First District (2nd Division)    No. 79-1171

Opinion filed December 30, 1980.

James J. Doherty, Public Defender, of Chicago (Robert D. Glick and Frances Sowa, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and Edward M. Rubin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Defendant Lawrence Harvey was convicted of rape and deviate sexual assault by a jury, was sentenced to concurrent penitentiary terms of

10 years, and appeals from the verdicts and sentences. As issues on appeal, Harvey claims error in the admission of hearsay statements in evidence; in the denial of his request for a hearing on the voluntariness of his statement to police; in the allowance of certain police testimony; in improper prosecutorial comment; in the failure of the evidence to prove his guilt beyond a reasonable doubt; and, in certain sentencing errors. For the reasons which follow, we affirm.

The State's case in chief developed evidence which showed that the victim, who resided with her two children in an apartment building on South Luella Avenue in July 1978, left the building on July 9 at 2 a.m. in order to move her car. The car could not be locked and she sought to move it closer to her residence than where it had been parked. She returned to the apartment building and, upon entering the vestibule, a man grabbed her from behind. She fell to the floor and the man, later identified by the victim as Harvey, placed a sharp object in her back and threatened to blow her brains out if she screamed. She told the offender that her boyfriend was waiting for her. They then walked up four steps to a window and upon the offender's order she jumped from the window ledge about four feet to the ground. Looking back to the window she observed the offender's face, the only time she observed it that night. She had seen the offender previously two or three times per week, in front of her building. The victim stated that she recognized his voice and scratch marks on his hands as he stood there. The only light in the dark area was a small bulb in the ceiling of the first floor landing. There were no lights in the gangway area. The offender told her he would blow her brains out if she ran, and he then jumped from the window and landed behind her.

The victim was directed into the alley, where the offender instructed her to remove her clothes and kneel, which she did. He then placed his penis into her vagina from the rear, then forced her to perform oral copulation, then told her to "play with herself," and thereafter raped her again. The offender told the victim to dress and wait five minutes before leaving, which she did. After five minutes passed, she went back into her apartment building, enlisted a neighbor to walk her to her car, drove to a service station after noticing the car's flat tire, and was driven to her boyfriend's apartment. He was not there, but a security officer in the building allowed her to use a telephone which she did to call her mother, whom she told she had been raped.

The victim was then picked up by her parents and two brothers and was ultimately taken by them to Billings Hospital where she was treated. That morning she gave investigating police officers a description of the man she thought had raped her, based upon what she had seen of Harvey in the past, rather than at the time of the incident. She told police that the offender was 5'10" tall, weighed 160 pounds, and wore a black, long-

sleeved shirt. She forgot to tell them that defendant had a mustache. She viewed police photographs, but could identify no one. Ten days later, as she drove by the apartment building, she recognized defendant standing in front of the building with other people. She called police and told them she saw the man who had raped her. She identified him for police near the building and defendant was placed under arrest.

The victim's mother testified that during the early morning hours of July 9, 1978, she was at home with her family when she received a telephone call from her daughter, who was hysterical and crying. Her daughter told her she had been raped and the family picked her up. She was hysterical, crying, shaking all over and in a state of shock. She was taken ultimately to Billings Hospital for treatment.

Chicago Police Officer Joseph Theilmann testified that on July 28, 1978, while assigned to a "beat" car, a radio message directed him to 75th and Yates Avenue where he met another "beat" car and the victim. They proceeded to 73rd and Luella Avenues, where the victim identified defendant as the man who had raped her. Officer Theilmann placed defendant under arrest. Michael Zelfeldt, a microanalyst employed by the criminalistics division of the Chicago Police Department testified that specimens taken from a vaginal swab of the victim revealed the presence of spermatozoa. The parties entered into a stipulation establishing the origin and custody of the vagina swab until it was examined in the laboratory. Certain other exhibits were received in evidence and the State rested.

After a defense motion for a directed verdict was denied the defense put on its case. Carlton Williams, employed by the pubic defender's office, testified that, in company with defense lawyers, he took photographs inside the victim's apartment building depicting the vestibule, hallway, the window and light fixtures. The light fixture was 15' to 20' from the window.

Phyllis Westmoreland testified that she knew defendant and lived in the same apartment building with a roommate Emma Macklin. On July 8, 1978, between 4 a.m. and 4:15 a.m., she saw defendant and Emma Macklin sitting together outside the building. They had been celebrating Emma Macklin's birthday and had come to her apartment several times to get phonograph records. Westmoreland was babysitting for Macklin's nine-year-old boy and at 2 or 2:30 a.m., she went to defendant's mother's apartment to ask Macklin to return because Westmoreland had to rise early the next day to go to work.

Emma Ruth Macklin testified for the defense that she had been defendant's girlfriend for three years. She and defendant had been celebrating her birthday at a friend's home until 12 p.m. on July 8, and then, after securing some liquor, at his apartment. She and defendant

were together there until 7 a.m. on July 9, when she left. He did not leave the apartment the entire time, except to go with her to her apartment for records after which they returned to his apartment.

Chicago Police Investigator Anthony Lowrey testified that he had interviewed the victim about the incident at the police station. Pursuant to the interview, he wrote that the victim saw a window nearby, broke away, and jumped out of the window. The victim told him that the offender lived in the area and gave him the following description: "one unknown male negro, age twenty-three to twenty-six years old, five feet ten, one hundred sixty-five, brown, light complexion, black hair, possible needle marks on arm and hand, last seen wearing a black long-sleeved shirt."

Emma Macklin, recalled by defendant, testified that he had worn a mustache for as long as she had known him and that he was missing his two bottom front teeth.

After failing to have an exhibit received in evidence, a photograph showing the inside first floor landing and location of the light source, the defense rested.

The State sought to call assistant state's attorney Joel Goldstein in rebuttal. Defendant objected. Goldstein would testify that as a member of the Felony Review Unit he interviewed defendant at the time of the arrest. Defendant told him that he knew nothing of the rape and was at home with his mother at the time of the incident sleeping. The defense claimed that the State was offering Goldstein's testimony as an admission in order to contradict the alibi testimony given by defense witnesses and was in fact a prior inconsistent statement that could not be used since defendant did not testify. It was also argued that use of the statement would violate defendant's Fifth Amendment right to remain silent. Defendant's objection was overruled as were his motions for a voluntariness hearing and for a mistrial.

Goldstein testified that on July 28, 1978, after advising defendant of his constitutional rights, defendant indicated he wanted to talk with Goldstein about the incident. Defendant denied any knowledge of the incident but stated that he had seen the victim many times on the street and had spoken to her, but she just nodded and passed by. He told Goldstein that on July 9, 1978, at about 1 a.m. he had arrived home. Only his mother was there, and he went to bed. Goldstein testified that he saw needle marks on defendant's hand and asked him if he used narcotics, but thought defendant denied that he was a user. The State then rested.

The defense moved for a mistrial based upon Goldstein's needle mark testimony which was denied. Other procedures and evidence will be discussed in the body of opinion. After final arguments the jury returned the guilty verdicts first noted above. A defense motion for a new

trial was denied. After a hearing on aggravation and mitigation, the court sentenced defendant, also as first above noted.

## I.

Defendant argues first that it was error to permit assistant state's attorney Goldstein to testify in rebuttal to defendant's denial of his involvement or knowledge of the incident; that he was at home alone with his mother at 1 a.m.; and that he then went to sleep, because the statement was hearsay and did not fall within the ambit of an admission. The statement cannot be an admission, the defense asserts, because it was exculpatory, rather than inculpatory and the prejudicial effect was obvious. The State counters that defendant's statement to Goldstein tended to prove his guilt along with other evidence in the case and was properly admitted.

■■ There appears little question as to the nature of Goldstein's testimony being proper rebuttal evidence. Such evidence is that which answers or contradicts new affirmative matters raised by the defense during the presentation of its case in chief. (*People v. King* (1978), 61 Ill. App. 3d 49, 377 N.E.2d 856; *People v. Thornton* (1977), 54 Ill. App. 3d 202, 369 N.E.2d 358.) The admission of such evidence is within the trial court's discretion, and its exercise will not be interfered with on review unless an abuse of that discretion is shown. (*People v. King; People v. Gentry* (1974), 19 Ill. App. 3d 861, 312 N.E.2d 441.) In the present case, the statement made by defendant to Goldstein was properly admitted to test whether or not defense alibi witnesses were truthful in testifying that defendant was with them or seen by them elsewhere when the victim was being attacked, the major thrust of the defense presented. (*People v. Green* (1975), 26 Ill. App. 3d 662, 669, 325 N.E.2d 316, *modified on other grounds* (1975), 62 Ill. 2d 146, 340 N.E.2d 9; 3A Wigmore, Evidence §1000 (Chadbourn rev. 1970); McCormick, Evidence §47 (2d ed. 1972).) We find no error in its admission.

## II.

The defense contends next that the trial court erred when it denied defendant's motion for a rehearing to show that his statement to Goldstein was involuntary, after the court denied his motion *in limine* to bar that evidence. The motion was denied by the trial court because it was deemed a dilatory tactic on the part of counsel for the defense. The State maintains that a hearing on voluntariness was properly denied under section 114—11(g) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 114—11(g)), which requires the filing of written motions to suppress confessions to be made before trial unless opportunity therefor did not exist or defendant was not aware of the grounds for the

motions. Because it responded to pretrial defense discovery motions to the effect that defendant made certain oral statements which were set forth in the police reports, the State maintains that the defense had sufficient opportunity to raise the issue of voluntariness which it failed to do prior to trial.

■■ ■ The statement at issue is not a confession, however, and section 114—11(g) does not apply. (See, *e.g., People v. Kennedy* (1978), 66 Ill. App. 3d 267, 373 N.E.2d 713.) We find that defendant timely raised the question of voluntariness, coming as it did prior to the introduction of Goldstein's testimony and "* * * the voluntary character of any out-of-court statement must first be established before the statement may be used, even for impeachment purposes." (*People v. Lefler* (1967), 38 Ill. 2d 216, 220, 230 N.E.2d 827, 829; *People v. King* (1978), 61 Ill. App. 3d 49, 56.) A hearing should have been held on the question of voluntariness. Nevertheless, we find the error harmless in light of other evidence in the case. The State's case was not dependent upon Goldstein's testimony; rather, it rested upon the positive identification of defendant by the victim as he stood at the window ready to jump to where she had preceded him, the sound of his voice and scratches on his hands; a man whom she had seen and heard in conversations on a number of previous occasions. Any error committed in this regard must be deemed harmless beyond a reasonable doubt.

### III.

At the conclusion of the State's case in chief, the defense asked the court to call Officer Downing, the incident officer in the case, as the court's witness, in order to impeach the victim's statement that she had seen defendant in the neighborhood prior to the attack. The police report contained a statement by the victim that an "unknown offender accosted her in the hallway," and the defense intended to ask the officer about the circumstances of that statement in conjunction with the victim's description of defendant. The trial court was apprised that the reason for the defense request was that, based upon a previous interview by counsel of Officer Downing, the defense could not vouch for his credibility on this point. Recognizing that the decision as to whether a person should be called as a court's witness rests within the trial court's discretion (*People v. Martin* (1979), 80 Ill. App. 3d 281, 399 N.E.2d 265; *People v. DeFord* (1978), 59 Ill. App. 3d 942, 376 N.E.2d 97), the defense asserts that the failure to call such a witness is an abuse of discretion and prejudicial error where such failure deprives a defendant of an orderly way in which to establish his defense. *People v. Mostafa* (1971), 5 Ill. App. 3d 158, 274 N.E.2d 846.

■■ The trial court in the case at bar declined to call Officer Downing as

its witness because there was no evidence that the officer had ever asked the victim whether she had seen defendant before the attack or what her answer would be, making that issue speculative. Defendant elected not to call Officer Downing at all. There was no evidence presented to the court that Downing was either biased or hostile toward either party. Having failed to call him, defendant was unable to show whether his testimony supported defendant's thesis, in any event. In the absence of any showing of hostility, unwillingness, bias, untruthfulness or surprise, no basis exists for requiring the trial court to call Downing as the court's own witness and its refusal to do so under these circumstances was not error. *People v. Bridgeforth* (1972), 51 Ill. 2d 52, 281 N.E.2d 617; *People v. Jackson* (1980), 89 Ill. App. 3d 461, 41 N.E.2d 893; *People v. Bolden* (1977), 53 Ill. App. 3d 848, 368 N.E.2d 1319.

## IV.

The defense urges that reversible error was committed when the trial court overruled an objection it raised with regard to the following comment made by the prosecutor in closing argument:

"Because he didn't get a cup of coffee, that is what he [defense counsel], said about the assistant state's attorney, he didn't give him a cup of coffee, therefore he is mistaken. You hear any testimony he was mistaken? Not one thing."

According to defendant the foregoing comment violated his constitutional and statutory right to refrain from testifying, citing *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229; *People v. Wollenberg* (1967), 37 Ill. 2d 480, 229 N.E.2d 490; Ill. Rev. Stat. 1977, ch. 38, par. 155—1. This is so, the defense maintains, because no one but defendant could have testified that the statement assistant state's attorney Goldstein made was in error.

The State contends that the prosecutor's comment came after defense counsel suggested that defendant simply may have been mistaken in telling Goldstein he had been with his mother, since his mother was normally at home, he didn't know what weekend it was, or even that it was a weekend. The prosecutor was challenging the possibility of defendant's having made a mistake, the State asserts; the prosecutor pointed out first that the attack occurred during the time in which defendant and his girlfriend, Emma Macklin, had been extensively celebrating her birthday, something defendant would be unlikely to forget. Therefore, the State claims, the prosecutor was attempting to draw the jury's attention to defendant's failure to testify but rather that it was unlikely for defendant to have been mistaken when he said he was with his mother when the victim was raped, relying on *People v.*

*Matthews* (1979), 69 Ill. App. 3d 65, 387 N.E.2d 10, and *People v. Fulton* (1979), 68 Ill. App. 3d 915, 386 N.E.2d 605, among other cases.

■■ Our examination of the record reveals no prosecutorial intent to highlight defendant's failure to testify, as in *People v. Wollenberg*, where no other purpose would have been served, except that, in the emphatic comment by the prosecutor, "[n]o one else testified. Let's get that straight." (37 Ill. 2d 480, 487.) Here, the prosecutor's comment, "You hear any testimony he was mistaken? Not one thing," was essentially, to overcome the defense suggestion of mistake, not to highlight defendant's declination to testify. It was permissible for the prosecutor to comment as he did in response to the defense explanation, even though the only person who could have contradicted the State's evidence was defendant. (*People v. Fulton; People v. Long* (1978), 65 Ill. App. 3d 21, 382 N.E.2d 327; *People v. Vinson* (1978), 61 Ill. App. 3d 684, 378 N.E.2d 348.) We find no error in the trial court's ruling in this regard.

## V.

■■ Defendant charges that he was not proven guilty beyond a reasonable doubt, particularly because the victim's testimony revealed such unfavorable conditions upon which she made her identification and because the description she gave police was based upon what she had seen of defendant in the neighborhood in the past, rather than what she had seen of the offender at the time of the attack. The record reveals, however, that the victim had seen defendant several times per week over a period of time in the past, had heard his voice before, and had seen scratch marks on his hands. Her view of defendant standing at the window before he jumped down to join her on the ground, in addition to his threats to blow her brains out if she screamed or ran, and his verbal directions to her prior to, during and after the attack formed a sufficient basis upon which the jury could accept her identification testimony. Her description of the rape and deviate sexual act she was forced to endure were uncontradicted and supported by testimony of later events supplied by her mother, and technical and police testimony. We see no basis for disturbing the jury's assessment of the evidence in finding defendant guilty as charged. (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671; *People v. Toellen* (1978), 66 Ill. App. 3d 967, 384 N.E.2d 480; *People v. MacRae* (1977), 47 Ill. App. 3d 302, 361 N.E.2d 685.) Defense reliance upon *People v. Thompson* (1970), 121 Ill. App. 2d 163, 257 N.E.2d 197, is misplaced since, in that case, the victim saw the offender there for only an instant and, unlike the facts in the case before us, had never before seen him.

The defense also points out that credible alibi evidence may not be disregarded on review, citing *People v. Gardner* (1966), 35 Ill. 2d 564, 221

N.E.2d 232. The jury had the right to weigh the alibi testimony against contradictory evidence that defendant had not been with the alibi witnesses, but was elsewhere at the time of the attack. Their adverse finding will not be disturbed since it was the jury's function to determine the credibility of such alibi evidence. *People v. Vriner*; *People v. Toellen*; *People v. MacRae*.

## VI.

Defendant's final point relates to sentencing errors perceived by him as having been committed by the trial court. One of these alleged errors is that the trial court failed to set forth particular reasons for imposing the sentences as required by section 5—4—1(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—4—1(c)). Hearings on defendant's post-trial motions were held on February 21, 1979, within three weeks after the verdict was rendered. On that same date, the prosecutor and defense counsel presented matters on mitigation and aggravation, referring to the evidence in the case during their argument. The trial court thereafter stated:

> "All right, the court having considered the nature of the charges, the matters brought to the attention of the court during the trial, having considered the background of the defendant, having considered the pre-sentence investigation, having considered all those matters that the court must consider as described by statute, taking into consideration aggravation and mitigation before the court imposes sentence, it is in the sentence of this court, * * *."

The court then went on to impose the sentences.

■■ A trial judge must now specify his reasons for the sentence being imposed, under the provisions of section 5—4—1(c) aforesaid. It would have been preferable for the court to have more specifically identified the underlying reasons for the sentences in the case at bar, instead of the minimal reasons here articulated. (See, *e.g., People v. Cordova* (1980), 83 Ill. App. 3d 147, 403 N.E.2d 788.) Had the defense desired a more explicit explanation of the factors the court had considered, however, it should have objected and thereby afforded an opportunity to the court to provide an embellished statement. Having failed to do so, and having failed to claim any prejudice resulting from its absence, defendant's complaint in this regard must be deemed meritless. *People v. Taylor* (1980), 82 Ill. App. 3d 1075, 1078, 403 N.E.2d 607.

■■ Defendant also complains of the excessiveness and arbitrariness of the sentence. An examination of the evidence, heretofore set out in the foregoing opinion, reveals no bases upon which to concur in defendant's conclusion. The crimes of rape and deviate sexual assault committed by defendant were deliberate, brutal and savage; they fall within the Class X

category of offenses (Ill. Rev. Stat. 1979, ch. 38, pars. 11—1, 11—2), making defendant subject to terms of from 6 to 30 years (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(3)). In having receiving concurrent terms of only 10 years, defendant was sentenced toward the lower end of the permitted range. We find no abuse of discretion and no basis for disturbing the sentences prescribed. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

For the reasons aforesaid, the jury verdict, judgment and sentences in this case must be affirmed.

Affirmed.

PERLIN, P. J., and STAMOS, J., concur.