THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARCHIE COLE, Defendant-Appellant.

Second District   No. 2—92—0393

Opinion filed January 24, 1994.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Lisa A. Hoffman, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Archie Cole, appeals from his conviction of armed violence (Ill. Rev. Stat. 1991, ch. 38, par. 33A—2 (now 720 ILCS 5/33A—2 (West 1992))). Prior to trial defendant filed a motion to suppress evidence. The motion was denied, and defendant proceeded with a bench trial and stipulated to the evidence, specifically preserving the suppression issue for review. The trial court found the defendant guilty and sentenced him to six years in prison. Defendant asserts that the lower court erred in denying his motion to suppress.

At the suppression hearing North Chicago police detectives Richard Theis and Walter Holderbaum testified for the State. During a four-day period in January 1992, the North Chicago detective bureau conducted a four-day special operation in the 1200 block of Broadway. According to Theis, the location was a high-crime area, and complaints of drug trafficking prompted the operation. On the night of January 13, 1992, both detectives participated in the operation and both wore clothing and gear which clearly identified them as police officers. Theis carried a flashlight.

There were two-story apartment buildings at 1227 and 1301 Broadway, with a courtyard in between. Around 10:30 p.m., while on foot patrol in the courtyard area, the two detectives noticed defendant park a car in the alley behind 1227 Broadway. Theis approached the vehicle on the passenger side. Holderbaum followed close behind. As the officers approached, the passenger side window was lowered. Theis asked the occupant his name. The defendant, who was alone in the car, answered, "Derrick Cole." When Theis asked what he was doing there, defendant replied that he lived at 1227 Broadway,

apartment A. Theis informed defendant that he knew the Millers lived in apartment A. Defendant said they were his cousins. Theis believed that, at this time, Holderbaum said something to the effect that defendant, then, did not live in apartment A, and defendant replied, "No, I don't." Defendant had testified that Michelle Sanders, who lived in apartment A, was his cousin and that he himself lived in apartment B with Melvin Sanders, Mark Miller, Ronnie Neighbors, and Rickie Miller. According to defendant, Melvin Sanders and Mark Miller were also his cousins. Officer Theis stated that to his knowledge the Sanders and the Millers were related, and he went to both apartment A and apartment B quite often for investigations and complaints.

Following the exchange about where defendant lived, Theis asked for identification, specifically requesting a driver's license, since defendant "just drove up in this car." Defendant slid across the front seat and got out of the car by the passenger door. He then bent over the seat and, after looking through a black pouch, produced a State identification card which had been issued on March 22, 1990. The card bore the name Archie D. Cole and an address of 620 Helmholz. When Theis commented that he had said his name was Derrick, defendant responded, "It is Archie Derrick Cole." Theis and Holderbaum both then asked if he had a driver's license, whereupon defendant revealed that his license had been suspended and he had to get it reinstated.

Theis took the defendant's identification card and ran a computer check. Both detectives testified that defendant was walking around freely during this time. He played with his dog, which was chained to a nearby tree, eventually letting him loose and saying that he was going to take the dog into the apartment. By this time, however, Theis had learned that defendant's license was suspended. The officers told defendant he was going to have to chain the dog back up because he was under arrest for driving with a suspended license. Just prior to doing a pat-down search, Theis asked defendant if he had anything Theis should know about. Defendant indicated he had a gun in his right front pocket. Theis found the gun and immediately handcuffed defendant and took him to a police van. A search of defendant's black pouch revealed the presence of cocaine. The detectives stated that they never threatened the defendant, never directed him to go or remain anywhere or controlled his movement prior to arrest, never intentionally touched him, and never confronted him with weapons.

Defendant's testimony conflicted in some regards with that of Theis and Holderbaum. In particular, defendant testified that he was

already out of the car, had unhooked his dog, and was walking toward the building when the detectives approached and told him to, "Come here." He also said that he told the police he lived in apartment B, not apartment A, as Theis and Holderbaum testified. On cross-examination defendant admitted that, prior to his arrest, Theis and Holderbaum never displayed their weapons, never physically touched him, never told him to get into the police vehicle, never threatened him, and never put him in a prone position.

Maintaining that he was illegally seized by Theis and Holderbaum in violation of his rights under the fourth amendment to the Federal constitution as well as under the constitution of Illinois (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6), defendant contends that the evidence secured as a result of that seizure, *i.e.*, the gun and the cocaine, should have been suppressed. Specifically, defendant claims that an improper stop by police occurred when Theis and Holderbaum required him to produce a driver's license, while, at the same time, they retained his State identification card. The State responds that there was no stop since defendant's contact with the police was consensual.

The trial court found that the police officers had not stopped or seized the defendant prior to his arrest. Rather, they had merely asked some questions and engaged in conversation with him and obtained incriminating responses which resulted in the defendant's arrest and search. The ruling of the trial court on a motion to suppress will not be disturbed unless it is manifestly erroneous. (*People v. Galvin* (1989), 127 Ill. 2d 153, 162-63.) Too, it is the function of the trial court on such a motion to determine the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence. *Galvin*, 127 Ill. 2d at 163.

We must determine when, if at all, a seizure occurred since the fourth amendment is implicated only at the point police conduct constitutes a seizure. (See *Florida v. Royer* (1983), 460 U.S. 491, 497-98, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324; *United States v. Mendenhall* (1980), 446 U.S. 544, 552-53, 64 L. Ed. 2d 497, 508-09, 100 S. Ct. 1870, 1876; *People v. Graves* (1990), 196 Ill. App. 3d 273, 277; *People v. Long* (1983), 99 Ill. 2d 219, 229.) The fourth amendment is not involved where the police merely approach an individual in a public place and ask him if he is willing to answer questions or put questions to him if he is willing to listen. (*Royer*, 460 U.S. at 497, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324.) Even when officers have no basis for suspecting an individual, they may generally ask that individual questions, ask to examine identification, and request consent to search his or her luggage as long as they do not communicate a

message that compliance with their requests is required. (*Florida v. Bostick* (1991), 501 U.S. 429, 434, 115 L. Ed. 2d 389, 398-99, 111 S. Ct. 2382, 2386, citing *Immigration & Naturalization Service v. Delgado* (1984), 466 U.S. 210, 216, 80 L. Ed. 2d 247, 255, 104 S. Ct. 1758, 1762, *Florida v. Rodriguez* (1984), 469 U.S. 1, 5-6, 83 L. Ed. 2d 165, 170-71, 105 S. Ct. 308, 310-11, *Royer*, 460 U.S. at 501, 75 L. Ed. 2d at 238-39, 103 S. Ct. at 1326; *Mendenhall*, 446 U.S. at 557-58, 64 L. Ed. 2d at 511-12, 100 S. Ct. at 1878-79.) So long as a reasonable person would feel free to disregard the questions and go about his business, the encounter is consensual, and such an encounter will not trigger fourth amendment scrutiny unless it loses its consensual nature. *Bostick*, 501 U.S. at 434, 115 L. Ed. 2d at 398, 111 S. Ct. at 2386.

A person is seized within the meaning of the fourth amendment only when, in view of all the circumstances surrounding the incident, a reasonable person would believe that he was not free to leave. (*Royer*, 460 U.S. at 501-02, 75 L. Ed. 2d at 239, 103 S. Ct. at 1326; *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.) Examples of circumstances which might indicate a seizure would be the threatening presence of several police officers, the display of a weapon by an officer, some physical touching of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. (*Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.) As can be seen, it is a reasonable person test which we must apply to the facts of this case. The "reasonable person" test presupposes an innocent person. *Bostick*, 501 U.S. at 436, 115 L. Ed. 2d at 400, 111 S. Ct. at 2388; *Royer*, 460 U.S. at 519 n.4, 75 L. Ed. 2d at 250 n.4, 103 S. Ct. at 1335 n.4 (Blackmun, J., dissenting).

Defendant concedes that his initial encounter with the police was consensual in that he voluntarily rolled down his car window and engaged in a conversation with them. He likewise acknowledges that the detectives' request for identification and their subsequent examination of his State identification card were a proper part of that initial engagement. However, according to defendant, the consensual encounter was transformed into a seizure when the detectives, although retaining his identification card, requested his driver's license. Defendant argues that a reasonable person would not feel free to walk away while the police held his identification card and that a request for a driver's license by two officers who had already been tendered another valid form of identification would carry an element of compulsion, thus overbearing a reasonable person. Defendant's argument is not persuasive.

The initial conversation with defendant as to where he lived,

combined with Theis' expressed knowledge of the residents of the building and defendant's claim that they were his cousins, created uncertainty about defendant's identity and residence. Hence, it was natural and reasonable for the officers to request some kind of identification. It was also predictable and reasonable to ask for a driver's license since Theis and Holderbaum had, indeed, seen defendant drive and park the car. However, the identification provided by defendant, which was not a driver's license, revealed not only a variation from the name he had given orally but also a completely different address. Although defendant explained the name difference, the uncertainty about his address remained. Once again, it was not unreasonable for the police merely to repeat their request for a driver's license. Moreover, that is all they did: ask for a driver's license. There was no evidence up to this point that either detective had used language or a tone of voice to indicate that compliance with the request might be compelled. Defendant had not been ordered to do or refrain from doing anything. Nor was there evidence of any physical show of authority. Neither officer had ever displayed his weapon or otherwise threatened defendant or even voluntarily physically touched the defendant.

That the officers still had defendant's State identification card when they again asked for a driver's license is not nearly so significant as defendant suggests. It appears the police had bare physical possession of the card and were simply still holding it when they asked for defendant's license. Defendant did not ask for the card back, and there is *no* evidence that Theis or Holderbaum intimated to defendant they would not return the card unless he produced a license. In fact, there is no evidence that the two detectives would not have returned the card had defendant asked for it or even reached out his hand to accept it back.

In light of all the circumstances, we do not believe a reasonable, innocent person would have considered himself held or restrained by the authority of the police, such that he was not free to leave if he chose to do so. Absent intimidation or threats, physical or verbal restraints, or conduct or language compelling compliance with requests, a reasonable person would have perceived the police requests for a driver's license to be a logical next step in an encounter marked initially by uncertainties and discrepancies. We also believe such reasonable person would think the police were holding his identification card, not as a coercive measure, but merely as a convenience, fully intending to return it when the person's hands were free after searching further for his license.

In sum, as defendant recognizes, his encounter with Theis and

Holderbaum was consensual up through the officers' examination of his identification card. Contrary to defendant's claim, however, what happened next did not transform the encounter into a seizure as contemplated by the fourth amendment. Rather, the situation remained consensual in nature, with the police permissibly asking questions and asking for identification. It was in this context that defendant gave the incriminating answers which led to his arrest and search. The trial court's finding in this regard was not manifestly erroneous and will not be disturbed.

We find support for our conclusion in *People v. Graves* (1990), 196 Ill. App. 3d 273, where this court determined there had been no seizure even though the deputy sheriff in that case ran a driver's license check on defendant's license. While it is not altogether clear, it appears the deputy in *Graves* took defendant's license with him to his squad car to do the check. Nevertheless, we specifically declined to hold, as a bright-line rule, that the running of a driver's license check, without more, rose to the level of a seizure. We chose instead to follow the traditional contextual approach. Accordingly, we observed that there was no evidence the officer ordered defendant to stay in his car while he checked the license. Nor did the deputy otherwise give defendant the impression he was not free to leave. Based on these facts the police check on the status of defendant's license did not amount to a seizure. In this case, the police did even less than the deputy in *Graves*. Theis and Holderbaum merely had momentary possession of defendant's identification. As far as we can tell, they did not take the identification card anywhere, and they did not run any kind of check on it. Nor did they attempt to control or direct defendant's physical movement. *Graves* teaches that, under these circumstances, there was no seizure.

Defendant invokes *People v. Taggart* (1992), 233 Ill. App. 3d 530, to support the position that the detectives' retention of his identification after they had examined it converted his encounter with the police into a seizure. In *Taggart* the defendant voluntarily offered his driver's license to the police officer, who then explained that defendant's van fit the description of a reported suspicious vehicle. After asking defendant to remain near the squad car, the officer approached the defendant's vehicle. This court concluded that defendant had been seized at the point the officer asked him to remain near the squad car. We stated that a person would not reasonably believe he was free to go "where a police officer told him his vehicle looked like a reported suspicious vehicle, held his driver's license and asked him to remain in a particular location while he approached the person's vehicle." *Taggart*, 233 Ill. App. 3d at 548.

While, as defendant notes, the retention of defendant's identification was a factor in determining whether or when a stop occurred in *Taggart*, it was not the only factor. Nor do we perceive it as the most significant factor. Our heaviest focus in *Taggart* was on the police officer's direction to the defendant to stay near the squad car. This directive, in conjunction with the other circumstances, would reasonably communicate to a person that his physical movement had been restricted and, consequently, he was not free to go. Unlike *Taggart*, defendant in this case was not told that either his vehicle or himself had aroused any suspicion. On the contrary, he was free to move about at all times. Prior to his arrest Theis and Holderbaum never told him to stay in one place, to go to a certain location, or *not* to do anything. Moreover, as we implied above, we do not think the police here "held" defendant's license in the sense that word is used in *Taggart*. All in all, *Taggart* is of little help to defendant.

Defendant notes that the trial court relied on *People v. McVey* (1989), 185 Ill. App. 3d 536, where a police officer pulled up behind a parked car without activating his emergency lights. Defendant got out of the car and gave the officer a valid California driver's license. The officer then told the defendant to go back to his car and have a seat because he was going to run a computer check of defendant's license. The *McVey* court held that a seizure occurred only when the officer required the defendant to return to his own car and have a seat while the officer ran a computer check. Defendant claims that *McVey* supports his position in that, besides retaining the defendant's driver's license, the officer compelled the defendant to stay in a certain place while the license was checked. Defendant urges that he, too, was subject to compulsion in the form of a demand for a driver's license by two officers. Defendant asks us to reach too far. Both *Taggart* and *McVey* turned most significantly on the physical restraint and control of the defendant resulting from the police officer's directive. Defendant here was never given any such directive. Further, as the State points out, Theis and Holderbaum asked for a driver's license right away, when they first asked for identification. It is not as though they asked for and received one kind of identification and then went on to request still another, different identification.

In *People v. Kennedy* (1978), 66 Ill. App. 3d 267, another case cited by the trial court, no stop had occurred even though the officer had taken the defendant hitchhiker's military card and social security card to run checks on them. When the defendant revealed, in response to another officer's question, that there was a gun in his bag, he was ordered to drop the bag and walk to the rear of a patrol car. The court held that a stop occurred only when the defendant was

asked to walk to the rear of the patrol car. The court relied on the fact that that was the first attempt by either officer to control the physical movement of the defendant. Defendant points out that, unlike this case, it is not clear in *Kennedy* whether the officer retained the identification cards while running the check. Far more significantly, however, as defendant also notes, *Kennedy* did not involve a coercive request or effect a demand. Despite defendant's attempts to persuade us otherwise, there was no such request or demand in this case, either. The trial court's reliance on *McVey* and *Kennedy* was not misplaced. We agree with the State that in *Taggart*, *Kennedy*, and *McVey* the key to seizure was the restraint of free movement. We also agree that that key is not present in this case.

Based on the reasoning set forth above, defendant's conviction is affirmed.

Affirmed.

INGLIS, P.J., and COLWELL, J., concur.