Wesley WILSON, Appellant (Defendant),

v.

STATE of Wyoming, Appellee (Plaintiff).

No. 92–111.

Supreme Court of Wyoming.

April 18, 1994.

Rehearing Denied May 16, 1994.*

---

* Justice Thomas and Justice Cardine would grant the Petition for Rehearing on the ground that there is a reasonable probability that the Court may have arrived at an erroneous conclusion or overlooked some important question or matter necessary to a correct decision. *Elmer v. State,* 466 P.2d 375 (Wyo.1970), *cert. denied,* 400 U.S. 845, 91 S.Ct. 90, 27 L.Ed.2d 82 (1970).

Leonard D. Munker, State Public Defender, Gerald M. Gallivan, Director, Wyoming Defender Aid Program, Stephanie Bryant,

Student Intern, and Aaron Phillips, Student Intern, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., and Barbara L. Boyer, Senior Asst. Atty. Gen., for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

TAYLOR, Justice.

The constitutionality of a police officer's actions in demanding a citizen's identification following an initial offer of assistance are challenged in this case of first impression before the court. Also questioned is the possible "taint" that an improper seizure may have created on subsequently obtained evidence. Determining that a violation of federal constitutional rights occurred when the officer, following the policy of his department, seized a pedestrian to complete a check for outstanding warrants without reasonable suspicion of present or past criminal conduct, we reverse the judgment and sentence imposed by the district court.

## I. ISSUES

Appellant presents two issues for review:
I. Whether the policy of the Casper Police Department to stop and ask persons for identification, in the early morning hours, without any justification violates the Fourth Amendment of the United States Constitution and Article I, § 4 of the Wyoming Constitution. It is an even greater intrusion to detain an individual until a records check is run to determine whether the individual is wanted for some violation.
II. Whether the seizure of Wesley Wilson violated the standards for a permissible seizure as set forth in the Fourth Amendment to the United States Constitution and Article I[,] § 4 of the Wyoming Constitution and defined by the United States Supreme Court and consequently, several pieces of evidence are tainted by the illegality and should have been suppressed.

## II. FACTS

Limping severely, Wesley Wilson (Wilson) walked rapidly eastbound on 12th Street in Casper, Wyoming on the morning of June 21, 1991. At 12:31 a.m., Officer Kamron Ritter (Officer Ritter) of the Casper Police Department watched Wilson's "lunging" steps and pulled his patrol car over to the sidewalk. Officer Ritter, believing that a fight may have taken place, asked if Wilson was okay and what happened to his leg. Wilson responded that he had twisted his ankle at a party. Smelling alcohol on Wilson's breath, Officer Ritter requested identification which Wilson provided. Officer Ritter radioed for a routine warrants check with the National Crime Information Center (NCIC) and local files. This initial encounter with Wilson lasted about a minute and a half.

The conversation with Wilson was interrupted when Officer Ritter detected smoke coming from 12th Street, west of where he was standing. At the same time, two motorcyclists stopped and reported to Officer Ritter that a fire was burning in a building up the street. Before leaving to check on the fire, Officer Ritter told Wilson to "stay in the area."

Officer Ritter reported the fire to the police dispatcher. The fire was in a building located one block away from where Officer Ritter had spotted Wilson. As he waited for the responding fire engines, Officer Ritter checked to make sure the burning building and other nearby homes were unoccupied. The deliberately set fire destroyed a garage-workshop.

After about eight minutes at the scene of the fire, Officer Ritter returned to check on Wilson. He had limped about 40 feet farther east and was attempting to cross 12th Street. As additional fire trucks approached, Officer Ritter helped Wilson cross the street. Officer Ritter then told Wilson to go to a nearby corner and "wait" while the officer returned to the fire scene.

As Officer Ritter provided traffic control, the police dispatcher radioed, at 12:41 a.m., that Wilson had two outstanding arrest warrants. Officer Ritter and Officer Terry Van Oordt then walked down the block to where Wilson was sitting on a lawn at the corner watching the fire. When the officers approached Wilson, they informed him of the

outstanding warrants and asked him to stand. Wilson told the officers it was difficult to stand with his injured ankle. The officers noticed an oily patch on the right shoulder of the shirt Wilson was wearing. Both officers touched the stained area and found an oily substance. Wilson volunteered, "What are you doing? I don't smell like smoke." The officers proceeded to arrest Wilson on the outstanding warrants. The following morning, in custody, Wilson made a voluntary statement implicating himself in starting the fire.

At a suppression hearing, Officer Ritter testified about his concerns for Wilson's safety during their initial encounter and that he had no suspicions of Wilson's involvement in the fire or of arresting him for public intoxication. Officer Ritter stated he followed routine Casper Police Department procedure to get the names of subjects police come in "contact" with "at that time of night" and "always" run a warrants check. Officer Ritter said he wanted Wilson to wait until the results of the warrants check were received. During their second encounter, when Officer Ritter helped Wilson cross the street, the officer testified he still had no suspicion of Wilson's potential involvement in the fire but wanted Wilson to wait for the completion of the warrants check. A Casper police detective also testified about the circumstances, including a *Miranda* warning, involved in Wilson's statement following his arrest on the outstanding warrants.

Wilson, who did not testify at the hearing, argued that the stop was illegal and the evidence gathered from the stop should be suppressed. Wilson also contended that the statements regarding smelling like smoke and implicating him in the starting of the fire should be suppressed. The district court denied the suppression motion, ruling that Officer Ritter's actions were "entirely reasonable in his effort to determine whether the man was hurt and what his situation was." Specifically, the district court found no illegality during the arrest and both of Wilson's statements were ruled admissible.

Wilson was convicted, following a jury trial, of felony property destruction, Wyo.Stat. § 6–3–201(b)(iii) (1988), and burglary, Wyo.

Stat. § 6–3–301(a) and (b) (1988). The district court sentenced Wilson to a term of not less than six years nor more than eight years at the Wyoming State Penitentiary on each count. The sentences were to run concurrently.

## III. DISCUSSION

In general, evidentiary rulings of a district court are not disturbed on appeal unless a clear abuse of discretion is demonstrated. *Armstrong v. State*, 826 P.2d 1106, 1111 (Wyo.1992); *Garcia v. State*, 777 P.2d 603, 607 (Wyo.1989). " 'An abuse of discretion has been said to mean an error of law committed by the court under the circumstances.' " *Armstrong*, 826 P.2d at 1111 (*quoting Martinez v. State*, 611 P.2d 831, 838 (Wyo.1980)). Findings on factual issues made by the district court considering a motion to suppress are not disturbed on appeal unless they are clearly erroneous. *Hyde v. State*, 769 P.2d 376, 378 (Wyo.1989); *Roose v. State*, 759 P.2d 478, 487 (Wyo.1988). *See* W.R.Cr.P. 12(f) (effective March 24, 1992) (formerly W.R.Cr.P. 16). Since the district court conducts the hearing on the motion to suppress and has the opportunity to: assess the credibility of the witnesses; the weight given the evidence; and make the necessary inferences, deductions and conclusions, evidence is viewed in the light most favorable to the district court's determination. *United States v. Werking*, 915 F.2d 1404, 1406 (10th Cir.1990). *See Rands v. State*, 818 P.2d 44, 46 (Wyo.1991). The issue of law, whether an unreasonable search or seizure occurred in violation of constitutional rights, is reviewed de novo. *See Lopez v. State*, 643 P.2d 682, 683–85 (Wyo.1982); *Cook v. State*, 631 P.2d 5, 7–8 (Wyo.1981); and *United States v. Walker*, 941 F.2d 1086, 1090 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992).

Wilson's statement of the issues presumes his appeal is one based on provisions of both the United States Constitution and the Wyoming Constitution. The language of Wyo. Const. art. 1, § 4 differs somewhat from its federal counterpart in providing:

The right of the people to be secure in their persons, houses, papers and effects

against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized.

See *Goettl v. State,* 842 P.2d 549, 558–75 (Wyo.1992), Urbigkit, J., dissenting (arguing search and seizure provisions of the state constitution provide stronger protection than the federal constitution). · However, we are unable to consider the impact of those differences in this situation because Wilson has not succeeded in invoking the independent protection of the Wyoming Constitution. *See Shongutsie v. State,* 827 P.2d 361, 366–67 (Wyo.1992); and *Richmond v. State,* 554 P.2d 1217, 1223 (Wyo.1976).

■ Wilson failed to offer any argument supporting an independent state constitutional claim. This court refuses to consider positions unsupported by cogent argument or pertinent authority. *Amrein v. Wyoming Livestock Bd.,* 851 P.2d 769, 772 (Wyo.1993); *Triton Coal Co., Inc. v. Mobil Coal Producing, Inc.,* 800 P.2d 505, 512 (Wyo.1990); *Kipp v. Brown,* 750 P.2d 1338, 1341 (Wyo.1988). The failure to present proper citation of authority and argument supporting "adequate and independent state grounds," *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3477, 77 L.Ed.2d 1201 (1983), prevents this court, as a matter of policy, from considering other than the federal constitutional principles at issue in this case. *Dworkin v. L.F.P., Inc.,* 839 P.2d 903, 909 (Wyo.1992); *State v. Wethered,* 110 Wash.2d 466, 755 P.2d 797, 800–01 (1988). *See* Judith S. Kaye, *A Midpoint Perspective on Directions in State Constitutional Law,* 1 Emerging Issues In State Constitutional Law 17 (1988).

■ The Fourth Amendment to the United States Constitution grants

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The protection of the Fourth Amendment is applied to state action under the due process clause of the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). *See* Laurence H. Tribe, *American Constitutional Law,* § 11–2 (2d ed. 1988).

The decision of the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) marked the initial recognition by the United States Supreme Court of some lesser standard than probable cause for intrusion upon constitutionally guaranteed rights. *See Keehn v. Town of Torrington,* 834 P.2d 112, 116 (Wyo. 1992);. *Olson v. State,* 698 P.2d 107, 109 (Wyo.1985); and 3 Wayne R. LaFave, *Search and Seizure,* § 9.1 at 334 (1987). In *Terry,* a police officer, observing specific conduct which his training and experience taught him was indicative of criminal behavior, conducted a limited seizure to investigate his reasonable suspicions. *Terry,* 392 U.S. at 23–24, 88 S.Ct. at 1881. In the course of such a seizure, the United States Supreme Court approved a limited search for weapons for the protection of the police officer. *Terry,* 392 U.S. at 27, 88 S.Ct. at 1888.

In *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973), the United States Supreme Court recognized the responsibility of local police officers, as opposed to federal agents, to undertake "community caretaking functions" for elemental reasons of safety. The *Dombrowski* court approved the search of a car's trunk after the drunken driver had been involved in an accident which left him comatose. The local police searched the car because the driver was an off-duty police officer from another jurisdiction and local police reasonably believed the officer's service revolver would be a hazard if left in the trunk of the abandoned car. *Dombrowski,* 413 U.S. at 446–47, 93 S.Ct. at 2530.

■ From this genesis, a general recognition of the rich diversity of police-citizen encounters has emerged. *See Terry,* 392 U.S. at 13–14, 88 S.Ct. at 1875–76. As this court recently acknowledged in *Collins v.*

*State,* 854 P.2d 688, 691–92 (Wyo.1993) (*quoting United States v. Berry,* 670 F.2d 583, 591 (5th Cir.1982)), three categories or tiers of interaction between police and citizens may be characterized. *See e.g., United States v. Black,* 675 F.2d 129, 133 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); and *Werking,* 915 F.2d at 1407. The most intrusive encounter, an arrest, requires justification by probable cause to believe that a person has committed or is committing a crime. *Rodarte v. City of Riverton,* 552 P.2d 1245, 1255 (Wyo.1976). The investigatory stop represents a seizure which invokes Fourth Amendment safeguards, but, by its less intrusive character, requires only the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime. *Lopez,* 643 P.2d at 683; *Werking,* 915 F.2d at 1407; *Black,* 675 F.2d at 133. The least intrusive police-citizen contact, a consensual encounter, involves no restraint of liberty and elicits the citizen's voluntary cooperation with non-coercive questioning. *Werking,* 915 F.2d at 1407; *Black,* 675 F.2d at 133.

The proper test for determining when a police-citizen encounter implicates Fourth Amendment rights as a seizure was initially outlined in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Justice Stewart, writing for a divided court, built upon a foundation first stated in *Terry.* "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1878 n. 16. In *Mendenhall,* Justice Stewart found no seizure had occurred where federal drug agents approached a woman walking through an airport and requested her identification:

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, **even where the person did not attempt to leave,** would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or **the use of language or tone of voice indicating that compliance with the officer's request might be compelled.** See *Terry v. Ohio, supra,* 392 U.S. at 19, n. 16, [88 S.Ct. at 1878, n. 16]; *Dunaway v. New York,* 442 U.S. 200, 207, and n. 6, [99 S.Ct. 2248, 2253, 60 L.Ed.2d 824]; 3 W. LaFave, Search and Seizure 53–55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall,* 446 U.S. at 554–55, 100 S.Ct. at 1877 (footnote omitted) (emphasis added).

■ While the opinion of Justice Stewart in *Mendenhall* was joined only by Justice Rehnquist, subsequent decisions have made it clear that the majority of the United States Supreme Court accepts the analysis to determine when a consensual encounter is transformed into a seizure. The four justice plurality in *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) applied the *Mendenhall* standard, as did Justice Blackmun in dissent. *Royer,* 460 U.S. at 514, 103 S.Ct. at 1332, Blackmun, J., dissenting. A majority of the court in *I.N.S. v. Delgado,* 466 U.S. 210, 215, 216–17, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984) used the standard to hold that no seizure occurred when immigration agents conducted surveys of factory workers' citizenships. *See also Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). Recently, in *California v. Hodari D.,* 499 U.S. 621, 624, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690 (1991), the United States Supreme Court explained that under the *Mendenhall* standard, a seizure based on a show of authority does not occur unless the subject yields to the authority.

The *Mendenhall* standard, therefore, creates an objective test, *Hodari D.,* 499 U.S. at 626–28, 111 S.Ct. at 1551–52, which makes

the subjective intent of the police officer irrelevant unless it is conveyed to the person being detained, *Mendenhall,* 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6, and like all search and seizure cases, the inquiry is very fact oriented. *Terry,* 392 U.S. at 27–31, 88 S.Ct. at 1883–85. The reasonable person standard also means the subjective perceptions of the suspect are irrelevant to the court's inquiry. LaFave, *supra,* § 9.2(h) at 407–08. Finally, the reasonable person standard "presupposes an *innocent* person." *Florida v. Bostick,* 501 U.S. 429, ——, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991) (emphasis in original). So, for example, arguments that a seizure must have occurred because a reasonable person who knows his luggage contains contraband would never agree to a search are rejected. *Id.*

During oral argument for this case, it was acknowledged that an analytical difficulty imposed by the *Mendenhall* standard lies in the determination of whether a reasonable person "would have believed that he was not free to leave" when being questioned by a police officer. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. *See* Lafave, *supra,* § 9.2(h) at 408–14. We find useful instruction in the Model Code of Pre–Arraignment Procedure, § 110.1 commentary at 259–60 (A.L.I.1975) (footnotes omitted):

> The motives that lead one to cooperate with the police are various. To put an extreme case, the police may in purely precatory language request a person to give information. Even if he is guilty, such a person might accede to the request because he has been trained to submit to the wishes of persons in authority, or because he fears that a refusal will focus suspicion, or because he believes that concealment is no longer possible and a cooperative posture tactically or psychologically preferable. Regardless of the particular motive, the cooperation is clearly a response to the authority of the police.

> By specifically authorizing law enforcement officers * * * to seek cooperation, the Code rejects the notion that a damaging response to an inquiry from a policeman can never be "voluntary." * * * [T]he extra pressures to cooperate with

what is known to be an official request require no further justification than that the request was made in the performance of law enforcement functions. That there exist such pressures seems to us, far from being regrettable, to be a necessary condition of the police's capacity to operate reasonably effectively within their limited grant of powers.

In *Mendenhall,* the United States Supreme Court, with reference to the Model Code of Pre–Arraignment Procedure, specifically states that a seizure is not established simply because "the person asking the questions was a law enforcement official." *Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1877.

The critical distinction between the position advanced by Wilson and that argued by the State is which type of encounter occurred in this case. Wilson basically contends that he was seized without reasonable suspicion during the period when his identification was being checked for possible warrants. The State asserts that Wilson was never seized in a manner that would implicate Fourth Amendment rights, until he was validly arrested on the outstanding warrants. Our analysis requires a detailed consideration of the distinctions between a citizen's voluntary compliance and a seizure.

■ The initial encounter between Officer Ritter and Wilson was prompted by the officer's concerns for the safety of a citizen. The officer conducted himself in a reasonable manner by simply pulling his patrol car to the curb to talk with Wilson. No flashing lights or siren sounds were used to signal Wilson to stop. The community caretaker function outlined in *Dombrowski,* 413 U.S. at 441, 93 S.Ct. at 2528, permits police to act in a manner that enhances public safety. *State v. Marcello,* 157 Vt. 657, 599 A.2d 357, 358 (1991). The police officer's observation of specific and articulable facts, Wilson's lunging walk with a severe limp, reasonably justified a brief inquiry into his condition and the possible cause, such as whether Wilson was a victim of criminal conduct. *Id.* This portion of the initial encounter between Officer Ritter and Wilson occurred in a consensual atmosphere which implicates no Fourth Amendment interest. *Florida v. Rodriguez,*

469 U.S. 1, 5–6, 105 S.Ct. 308, 311, 83 L.Ed.2d 165 (1984).

When Officer Ritter requested Wilson's name and identification and Wilson complied, the encounter remained consensual. A request for identification is not, by itself, a seizure. *Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762; *Black,* 675 F.2d at 136. Indeed, a reasonable person in physical distress should feel less intimidated by a police officer's offer to help and a request for identification than someone stopped at random. *United States v. Castellanos,* 731 F.2d 979, 984 (D.C.Cir.1984).

The district court made no specific factual finding whether Officer Ritter retained Wilson's identification or immediately returned it and the record does not disclose any testimony regarding this question. Without a specific finding, W.R.Cr.P. 12(f), any determination that a seizure did or did not occur when the identification was requested would be speculative. *See Royer,* 460 U.S. at 501, 103 S.Ct. at 1326 (holding officers who retained passenger's airline ticket and driver's license without indicating passenger was free to depart effectively seized him for purposes of Fourth Amendment).

After obtaining Wilson's identification, Officer Ritter radioed for the NCIC and local warrants check. Despite the request for the computerized warrants check, the encounter remained consensual. *People v. Kennedy,* 66 Ill.App.3d 267, 22 Ill.Dec. 905, 910–11, 383 N.E.2d 713, 718–19 (1978). Officer Ritter had not imposed any restriction on Wilson's freedom to leave as the warrants check was instituted.

Wilson challenges that the NCIC and local warrants check was initiated under a policy of the Casper Police Department to stop anyone, without cause, for the purpose of conducting a computerized identification check. If such a policy of random stops for identification without sufficient basis existed, we have no doubt that it would be unconstitutional under the standards announced in *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) and *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). *See also Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) (holding without articulable and reasonable suspicion of violation of law, stopping an automobile and detaining the driver to check a license and registration is unreasonable under the Fourth Amendment). Wilson's bald assertion, however, is simply not supported by the record. Officer Ritter, during cross-examination by defense counsel at the suppression hearing, testified that it is not standard procedure to stop everyone observed on Casper streets late at night. No documentary exhibit of department policy is of record in this proceeding and no testimony of supervisory officers supports Wilson's contention.

Officer Ritter did testify, however, that it is Casper Police Department policy to conduct NCIC and local warrants checks of everyone police "contact" late at night. The meaning of a "contact" was never defined. However, a seizure to conduct a computerized identification check without reasonable suspicion is not permitted. We acknowledge that "where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice." *United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). However, we do not find in the circumstances of Officer Ritter's encounter with Wilson justification for a seizure or *Terry* stop for the purpose of investigating past crime. *Brown,* 443 U.S. at 52, 99 S.Ct. at 2641. In *Hensley,* the United States Supreme Court directed that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Hensley,* 469 U.S. at 229, 105 S.Ct. at 680. Officer Ritter questioned Wilson and requested his identification solely on the basis of the officer's concern for a citizen's safety. The officer lacked any reasonable suspicion of past criminal conduct. Therefore, the question remains whether Wilson participated in a con-

sensual encounter with the police or whether he was seized, at some point, for the purpose of completing the identification check implicating Fourth Amendment rights. *Brown*, 443 U.S. at 50, 99 S.Ct. at 2640.

■■ The initial encounter ended when Officer Ritter detected smoke and the two motorcyclists stopped to report a fire. At that point, Officer Ritter told Wilson to "stay in the area." Under the *Mendenhall* standard, such a statement from a law enforcement officer might be regarded as a show of authority sufficient to warrant a reasonable person's belief that he or she was not free to leave. However, in this circumstance, we need not consider whether a seizure occurred at that point. Either Wilson disregarded the police officer's show of authority or felt sufficiently free to leave because, when left unattended, he limped away from the immediate area where the questioning had occurred. We hold no seizure occurred when Wilson was told to "stay in the area" since he failed to yield to the authority of the officer. *Hodari D.*, 499 U.S. at 626–28, 111 S.Ct. at 1551–52.

■■ When Officer Ritter left the fire scene and returned to check on Wilson for the second time, Wilson was in the process of crossing the street and walking away from the vicinity of the fire. Concerned about approaching fire engines, Officer Ritter assisted Wilson across the street by grabbing him at the elbow and supporting his weight. While *Mendenhall* refers to physical touching of the citizen by an officer as one example of a circumstance that might indicate a seizure, *Mendenhall*, 446 U.S. at 554–55, 100 S.Ct. at 1877, the physical touching in this instance did not effect a seizure. A reasonable person would not believe that an officer's assistance in crossing a street would represent a restriction on the person's freedom to leave. The aid Officer Ritter provided ensured Wilson's safety by removing him from the path of emergency vehicles. *Dombrowski*, 413 U.S. at 441, 93 S.Ct. at 2528.

■■ After Officer Ritter and Wilson crossed the street, the officer instructed Wilson to go to a specific street corner and wait. In *United States v. Coggins*, 986 F.2d 651,

652 (3rd Cir.1993), the court considered whether a law enforcement officer's order to wait resulted in a seizure of a possible drug dealer. During an airport encounter, the individual being questioned about his identification and tickets asked to leave to go to the bathroom. The officer told him to wait and the man briefly complied. The court held the order to wait and the man's submission by sitting back down resulted in a seizure. *Id.* at 654.

We hold a seizure occurred at the point when Wilson complied with the instruction to wait given by Officer Ritter in their second encounter. *Coggins*, 986 F.2d at 652. As Officer Ritter directed traffic, he could see Wilson sitting in front of a retail store at the specific corner the officer had directed. The persistence of Officer Ritter in returning to check on Wilson only supplements the determination that a seizure occurred. *See United States v. Wilson*, 953 F.2d 116 (4th Cir. 1991) (holding officer's prolonged and persistent questioning after suspect expressed willingness to leave resulted in a seizure). The show of authority by Officer Ritter restrained Wilson's liberty. *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1878 n. 16. A reasonable person would have believed he or she was not free to leave. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877.

With his seizure, Wilson's Fourth Amendment right to be free of unreasonable intrusions was implicated. *Terry*, 392 U.S. at 20–22, 88 S.Ct. at 1879–80. The narrow issue remaining is whether a brief detention for the purpose of completing a computerized warrants check is an unreasonable seizure. *Terry* presents a dual inquiry for evaluating the reasonableness of an investigatory stop, "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. at 1879. In assessing the officer's action, the United States Supreme Court "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Hensley*, 469 U.S. at 228, 105 S.Ct. at 680; *Terry*, 392 U.S. at 20–21, 88 S.Ct. at 1879. In assessing the

scope of the intrusion, the United States Supreme Court examines "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

▪ █ A substantial body of law has been developed on the propriety of computerized NCIC and warrant checks dealing primarily with traffic stops. The accepted standard is that an officer making a traffic stop may request a driver's license and registration, run a NCIC computer check to determine if the vehicle is stolen and the license is valid, and issue a citation. *United States v. Walker*, 933 F.2d 812, 816 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988). After these conditions are satisfied, however, the officer must have a reasonable suspicion of illegal activity to justify further temporary detention for questioning. *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991) (involving a Wyoming traffic stop).

The predicate for the NCIC check in the case of a traffic stop is usually provided by some violation of motor vehicle laws, most commonly speeding. The officer's observation of the violation provides the articulable facts and reasonable suspicion sufficient to permit the limited intrusion. *See, e.g., Walker*, 933 F.2d at 815.

There is no authority that permits an officer to hold a person, stopped for no other reason tha[n] a minor traffic violation, for an extended period of time in order to investigate whether an arrest warrant has been issued for the motorist without reasonable articulable suspicion that the person is wanted for any past crime.

*United States v. Doe*, 801 F.Supp. 1562, 1579 (E.D.Tex.1992).

█ When no observed violation of law is present, the intrusion required to run a NCIC or warrants check requires reasonable suspicion of criminal conduct. *United States v. Corral*, 823 F.2d 1389, 1393 (10th Cir. 1987), *cert. denied*, 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 921 (1988); *United States v. Lopez*, 777 F.2d 543, 547–48 (10th Cir. 1985). The Supreme Court of Rhode Island considered the issue in *State v. DeMasi*, 448 A.2d 1210, 1213–14 (R.I.1982), *cert. denied*, 460 U.S. 1052, 103 S.Ct. 1500, 75 L.Ed.2d 931 (1983) and determined that because a police officer had reasonable suspicion, a brief detention to conduct a NCIC warrant check was permitted. The officer observed a heavily laden car traveling in an elusive manner in an industrial area prior to dawn with a passenger who continued to turn around monitoring the police cruiser. *Id.*

In *United States v. Luckett*, 484 F.2d 89, 90 (9th Cir.1973), two city police officers in Gardena, California observed a man cross a street, at 12:30 a.m., against a traffic light. The officers stopped to question the man about a possible jaywalking violation and requested his identification. The man produced five pieces of identification and the officers issued a citation, but detained the man to complete a warrants check for the sole reason that a driver's license was not included in the identification the man provided. *Id.* When the warrants check revealed an outstanding traffic warrant, the officers arrested the man and discovered a package of counterfeit money orders in his pocket. *Id.* The court determined that the officers could detain a man stopped for jaywalking only for the time necessary to obtain sufficient identification and issue a citation. *Id.* Continued detention for a warrants check was improper because the officers lacked reasonable grounds to suspect a warrant might be outstanding. *Id.* at 91.

█ Officer Ritter admitted in his testimony that at no time during the first or second encounters did he possess any articulable facts sufficient to create a reasonable suspicion of past or present criminal conduct. *See Terry*, 392 U.S. at 21, 88 S.Ct. at 1879. Acting in a community caretaker function, Officer Ritter stopped Wilson to inquire about his condition and ensure his safety. A seizure for the purpose of completing a NCIC and local warrants check was imper-

missible as a matter of law. *Luckett,* 484 F.2d at 91; *Doe,* 801 F.Supp. at 1579. Without the requisite justification for the seizure at its inception, Wilson's Fourth and Fourteenth Amendment rights were violated. *See Ybarra v. Illinois,* 444 U.S. 85, 92–93, 96, 100 S.Ct. 338, 343, 345, 62 L.Ed.2d 238 (1979).

Hypothetically, a police officer could have possessed reasonable suspicions at the time Wilson was seized. At that point, an officer would have known that a fire was burning in the area. The location of the fire was only one block from where Wilson had been observed. The direction Wilson was traveling was away from the location of the fire. The fire was reported shortly after Wilson would have been near the scene. Initial observations of the fire suggested it was deliberately set. The difficulty Wilson experienced walking suggests a rational inference that he could not have traveled any significant distance after injuring himself. A brief investigatory detention based upon these reasonable suspicions may have been permissible.

■■■ However, Fourth Amendment guarantees require the police possess a reasonable suspicion of possible criminal behavior *before* a limited seizure is permitted. *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. Reasonable suspicion requires the presence of specific and articulable facts and rational inferences on the part of the officer conducting the seizure. *Werking,* 915 F.2d at 1407. The Constitution does not permit this court, or any court, to construct after the fact justifications of police conduct. The reason is sound. Our constitutional guarantees would mean little if any search or seizure which produced evidence of criminal conduct was justified post hoc. The basic constitutional guarantee of freedom from unreasonable searches and seizures operates from a simple premise. Prior to the issuance of a warrant, the police must demonstrate probable cause. Similarly, prior to conducting an investigatory stop, the police must possess reasonable suspicions of criminal behavior. In other words, the officer's action must be "justified at its inception." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. Officer Ritter's testimony simply fails to disclose that he had formulated any reasonable

suspicion of criminal conduct to justify the seizure of Wilson.

In a society burdened by crime, the protection of individual liberties requires difficult choices. All of us want to be able to freely walk the streets of our cities and towns. While we cannot and should not tolerate crime and lawlessness, we equally cannot tolerate the abrogation of basic liberties. Permitting a seizure, without reasonable suspicion of criminal behavior, to complete a computerized identification check of a police "contact" represents an unreasonable intrusion on basic liberties.

"The purpose of the exclusionary rule is to deter unlawful police action." *Michigan v. DeFillippo,* 443 U.S. 31, 38 n. 3, 99 S.Ct. 2627, 2633 n. 3, 61 L.Ed.2d 343 (1979). The rule has been applied to invalid seizures for warrants checks. When a police officer stopped two young men standing on a sidewalk without any suspicion, other than their nervous behavior, the court in *Hill v. State,* 140 Ga.App. 121, 230 S.E.2d 336, 337 (1976) determined an improper seizure occurred during the time the men were detained for a NCIC check. As a result, evidence obtained from the seizure, including a confession, was ordered suppressed. *Id.* at 338–39. In *Luckett,* 484 F.2d at 91, the court required suppression of the counterfeit money orders seized following the improper detention for a warrants check. The Court of Appeals of Maryland in *Ott v. State,* 325 Md. 206, 600 A.2d 111, 119–22, *cert. denied,* —— U.S. ——, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992), determined that an illegal seizure, after a warrants check produced invalid results, required suppression of contraband found in a search incident to the arrest.

The illegal seizure of Wilson, to complete the NCIC and warrants check, "bar[s] from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). On retrial, the district court may consider whether the doctrine of inevitable discovery may apply to portions of the tainted evidence; specifically, the oily stained shirt or the burned shoe discovered on Wilson. *Nix v. Williams,* 467 U.S. 431,

104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), *cert. denied,* 471 U.S. 1138, 105 S.Ct. 2681, 86 L.Ed.2d 699 (1985).

## IV. CONCLUSION

Officer Ritter acted in accord with Casper Police Department policy in running a NCIC and local warrants check on a subject he came in "contact" with during the early morning hours. However, as applied in this case, the policy resulted in an impermissible intrusion on the constitutional rights of a citizen when a seizure occurred for the sole purpose of completing the warrants check. The citizen was not free to leave and the officer lacked any reasonable suspicion of present or past criminal conduct to justify the detention. The seizure of Wilson to complete the warrants check was illegal; therefore, the finding of the district court that no illegality occurred was clearly erroneous.

The decision of the district court to deny suppression is reversed and this case is remanded for retrial without the tainted evidence.

THOMAS and CARDINE, JJ., filed dissenting opinions.

THOMAS, Justice, dissenting.

I must dissent from the majority opinion in this case. In light of our recent decision in *Collins v. State,* 854 P.2d 688 (Wyo.1993), and the precedent from the Supreme Court of the United States and other courts applicable in this area, I must conclude the officer's conduct with respect to Wilson was reasonable in these circumstances, and there was no seizure which would invoke Fourth Amendment concerns.

The question in this case is whether a seizure occurred. That is a question of fact as the majority notes, and the decision of the trial court is not to be disturbed on appeal unless it is clearly erroneous. Furthermore, the majority recognizes our commitment to the view that the evidence is to be viewed in the light most favorable to the district court's determination. Contrary to the determination of the trial court, however, the majority finds a seizure did occur in this case. It appears the majority endeavors to justify its conclusion as a matter of law, but it clearly is reaching a different finding of fact. The pertinent cases applied to justify this resolution are distinguishable, and the result is different from what those cases would lead one to expect.

The majority opinion sets forth the proper test for determining when a police-citizen encounter is a seizure under the Fourth Amendment which is:

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *See Terry v. Ohio, supra,* [392 U.S.,] at 19, n. 16[, 88 S.Ct., at 1879, n. 16]; *Dunaway v. New York,* 442 U.S. 200, 207, and n. 6[, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824]; 3 W. LaFave, Search and Seizure 53–55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, *reh'g denied,* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980) (footnote omitted).

None of the examples recited in *Mendenhall,* 446 U.S. at 554–55, 100 S.Ct. at 1877, emerge from this record. In fact, a careful reading of other cases the majority relies upon leads to an ineluctable conclusion that the trial court correctly decided the issue. These cases also furnish guidance with respect to the objective standard espoused by the Supreme Court of the United States. *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Nothing can be found in this record to demonstrate

any seizure of Wilson's person ever occurred. The contact between the officer and Wilson never went beyond the elicitation of Wilson's voluntary cooperation so as to become a seizure if measured by any sort of objectivity.

Two of the cases relied upon in the majority opinion point the way to an objective resolution of whether a seizure has occurred when the circumstances, as in this case, remain equivocal in light of the *Mendenhall* standard. In both *United States v. Coggins*, 986 F.2d 651 (3rd Cir.1993), and *United States v. Wilson*, 953 F.2d 116 (4th Cir.1991), the subject made a request to leave and discontinue the contact. Such a request to leave serves as an objective manifestation that the contact no longer is consensual. This record is silent with respect to any such request by Wilson. The majority finds the encounter is divisible into two events, and the initial encounter ended because Wilson, when left unattended, felt free to leave. It even notes, "[e]ither Wilson disregarded the police officer's show of authority or felt sufficiently free to leave because, when left unattended, he limped away from the immediate area where the questioning had occurred." Op. at 223. It is apparent, because of the intervening emergency situation, the entire encounter was one event, and nothing is present in the record to demonstrate Wilson did not feel equally free to leave at all times during the encounter until he was arrested on the outstanding warrants.

In this case the factual resolution of the able and experienced trial judge is correct and sustainable. The judge said:

I'm going to deny the motion. It appears to me that the officer was entirely reasonable in his effort to determine whether the man was hurt and what his situation was.

I see no problem with the arrest or the feeling of the substance.

According to *Lanier v. South Carolina*, [474 U.S. 25, 106 S.Ct. 297, 88 L.Ed.2d 23] the 1985 case, they say quite clearly that even assuming an illegal arrest, there is no reason to stop or to suppress a confession that was given after the person was properly "Mirandized".

But anyhow, I find no illegality on the part of the arrest and I don't think he was under arrest at the time the statements were taken and **I don't think it was unreasonable.**

As a matter of fact, he stops him and then notices the fire and walks away leaving him unattended.

I find nothing wrong with it. I'll deny the motion to suppress.

If the test is indeed objective, then this court should refrain from invoking any subjective factors. If we maintain an objective posture, however, this contact cannot qualitatively be distinguished from what occurred in *Collins*. In *Collins*, we adopted the three-tier approach to police-citizen encounters. *See United States v. Berry*, 670 F.2d 583 (5th Cir.1982). The first tier is communication between police and citizens that involves no coercion or detention and, thus, does not lead to any implication of Fourth Amendment protection. In this case, advice of outstanding warrants came within ten minutes. Up until that time, there was no unlawful seizure of Wilson implicating Fourth Amendment rights. This is clearly a first-tier encounter, as the majority concedes, in a caretaker function which is valid under *Collins*. The officer asked for Wilson's name and identification which Wilson furnished. Then the officer requested an NCIC and local warrants check on Wilson.

At that time, the officer smelled smoke, and two individuals on motorcycles stopped to report a fire. The officer went to check the fire and asked Wilson to remain in the area. Wilson wandered around and, later, the officer returned to check on him. After helping him across the street, the officer told Wilson to wait on the street corner. The fact Wilson complied does not eliminate his cooperation. Nothing indicates he did not still feel free to leave if he chose.

Until the officer received advice of the outstanding warrants for Wilson and then arrested him, the encounter was clearly consensual, even under the authority cited in the majority opinion. Wilson did not even testify as to his subjective state of mind at the hearing on the motion to suppress. The officer testified he would not have pursued

Wilson if he had chosen to leave because he had no reason to detain him if Wilson did not consent. The majority of this court has substituted its own subjective rationale in this case for the subjective intent of either the police officer or Wilson.

To reach a different result from *Collins*, one must perceive the two cases as factually distinguishable. Any factual distinction, however, is present only when we usurp the prerogative of the trial court to decide questions of fact. It is obvious that has occurred in this instance. The majority advances its subjective conclusion as to how it would have understood the direction from the officer, rather than the objective facts presented to the trial judge when he concluded no seizure occurred.

Several events were occurring simultaneously. A fire was detected, and the officer had to devote his attention to reporting the fire and assisting with direction of traffic. According to the majority statement of the facts, the first contact occurred at 12:31 a.m. The advice warrants were outstanding was given to the officer at 12:41 a.m. Laying aside the question whether there was any constraint upon Wilson's freedom to leave, an elapsed period of ten minutes, during which the officer's attention was devoted to the fire and traffic direction, is not unreasonable. The record reveals, of the ten minutes, Wilson was in the presence of the officer less than three minutes.

The majority concedes the initial encounter was entirely proper and the officer's request for Wilson's name and identification was permissible. The majority concedes the officer did not impose any restriction on Wilson's freedom to leave while the warrants check was being instituted. There is absolutely nothing to distinguish the further direction by the officer after helping Wilson across the street from the first direction to "stay in the area," unless we recognize it may have been important to keep Wilson out of the way of the fire trucks responding to the fire.

In assuming our proper role of assisting in the protection of the rights of the citizens of Wyoming to be secure in their persons and property, this court should not follow the lead of more permissive tribunals in endeavoring to discover academic technicalities to justify reversing criminal convictions. While the majority offers an apology for failing to protect the victim's property in this instance, I will feel more confident that a balance is being drawn when the academic technicalities are invoked in favor of the innocent victim equally with the miscreant. In my judgment, invocation of Constitutional protection to justify reversing Wilson's conviction simply demonstrates victimization of our society, rather than protection of our society.

The American bench needs to understand that its invocation of the premise of protecting Constitutional rights in reversing criminal convictions has contributed to the development of a society in which violence stalks our streets and fear permeates our neighborhoods. Every decision that tightens the cuffs with which we shackle our law enforcement officers contributes to such evolution. We must remember this rule applies to serial killers and multiple rapists as well as to inept firebugs who are simply a nuisance to property, until someone dies in the fire. The wisdom reflected by Benjamin Franklin, with acknowledgment to George Herbert, in the *Maxims prefixed to Poor Richard's Almanac* (1757) bears repeating:

> A little neglect may breed mischief: for want of a nail the shoe was lost; for want of a shoe the horse was lost; for want of a horse the rider was lost.

I cannot better state my position than to quote from an earlier dissent:

> While I agree that the majority approach is not an accurate application of constitutional requirements, I also have a deep philosophical difference with what the court has done. My analysis of this decision is based upon the premise that the application of constitutional principles is not an end in itself but a means to an end. Invoking constitutional principles as an end in itself is a purely academic approach. Those principles, however, evolved out of a desire to promote the well-being of the citizens of a fledgling nation and to secure for each of them those ideals articulated in the Declaration of Independence:

" * * * [T]hey are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, * * *."

It is in the light of these claims that I borrow from Handler, *Jurisprudence and Prudential Justice,* 16 Seton Hall L.Rev. 571, 572 (1986), this statement, somewhat out of context:

" * * * Indeed, as a constituent and vital part of representative democratic government, the judiciary must be highly attuned to the needs and feelings of its citizens; it should be acutely aware of the public's perception of its general performance, as well as its particular decisions. In short, the judiciary cannot be oblivious to the reactions that its own actions have engendered or the effects that its adjudications have created within the society it serves."

*Harvey v. State,* 774 P.2d 87, 112 (Wyo.1989) (Thomas, J., dissenting).

In my judgment, the real question to be addressed in this case is: What was going on that was wrong? The obvious answer is it was wrong for Wilson to set fire to another citizen's garage-workshop. Wilson then implicated himself in a voluntary statement made at an interrogation following his arrest upon a warrant for an entirely separate violation. The conclusion Wilson's conviction should not be upheld because of an academic fascination with the supposed wrongful conduct of the police officer does not serve the interests of the citizens of Wyoming and their property rights, which are not constitutionally subordinated to the rights of their persons.

The majority cites several cases from the United States Court of Appeals for the Tenth Circuit articulating the proposition that an officer making a traffic stop may request a driver's license and registration, run an NCIC computer check to determine if the vehicle is stolen and the license is valid, and issue a citation. Those cases, in which a seizure was implicit in the initial stop, are not helpful in resolving the question in this case. The question in the Tenth Circuit cases was the reasonableness of the length of the detention after a seizure was accomplished. Here, the question is whether there was a seizure.

I am persuaded no seizure occurred until Wilson was arrested because of the outstanding warrants. Even so, Wilson made a voluntary statement after being incarcerated on the warrants. He received proper advice with respect to his constitutional rights. His statement implicated him in the starting of the fire and, in my view, it was sufficiently attenuated from any possible influence from the seizure complained of that Wilson's statement clearly was admissible at trial. Given that, the statement he made to the officer at the scene could not have had much import in front of the jury.

The majority opinion creates more questions than it answers. Nothing will serve the judge in determining how he erred or how to decide similar issues in the future. It stands as an *in terrorem* adjudication, advising our trial bench that they must be careful to protect the rights of the accused, but it fails to offer definitive criteria. Consequently, no standard is advanced, and skillful defense counsel will always be sure to say their case is just like *Wilson v. State,* 874 P.2d 215 (Wyo.1994). Unfortunately, they will probably succeed in intimidating the trial judge into making some unnecessarily lenient ruling.

Furthermore, no guidance is offered with respect to the scope of the ruling as to the evidence obtained following Wilson's arrest. It seems implicit the evidence concerning the stain on Wilson's shirt and the burn marks on his sneakers is considered tainted, even though the latter information was obtained following a lawful arrest. No specific ruling is made with respect to Wilson's admission although it was attacked in the motion to suppress. When a conviction is reversed and the case remanded, the trial court is entitled to concrete guidance as to how to proceed.

I am satisfied this conviction should be affirmed. The only unreasonable factor in this scenario is the decision by this court.

Wilson's seizure did not invoke his Fourth Amendment rights. I most vigorously dissent.

CARDINE, Justice, dissenting.

The trial court denied a motion to suppress after hearing the testimony of witnesses and the presentations of the State and appellant. I would affirm the trial court's order denying the motion.

We agree that the initial stop of appellant and all that occurred up to the officer asking him to wait at a street corner until he returned was appropriate and lawful. The majority of the court finds that asking appellant to wait, what turned out to be ten minutes, was an unlawful seizure in violation of constitutional guarantees against unlawful searches and seizures.

The bare bones of what occurred here was that the officer noticed appellant limping down the street, thought he had been injured, and asked if he could help him. He asked for I.D., which is an accepted standard procedure. Appellant produced his driver's license. The officer called in for an NCIC report and was awaiting a response. He was also involved with directing traffic in the area of a fire which had been set by an arsonist. He asked appellant to await his return. I cannot see much difference between what occurred here and the usual course of accepted law enforcement activity.

It was claimed in appellant's brief that the Casper police department has a practice of random stops of citizens, interrogation and investigation. I would not approve the practice, but that is not what is involved in this case.

Here there was real evidence that a crime may have been committed (arson). The fire department and police had been called to the scene. Efforts to put out the fire and investigate the cause were ongoing. Request for identification from those present at the scene and brief detention to receive a further report are not violations of constitutional guarantees.

I would affirm the order of the district court.